## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SABRENA MILLER, BLAIR MILLER, )
and CASSANDRA GONZALES, )
    Plaintiffs, )
                     )
                     )
vs. )         **C.A. No. 1:22-cv-00181-SPB**
                     )
KIRK REESE, GREG MURPHY, )
FASO, SWEENEY, and JOHN DOE )
POLICE OFFICERS 1 through 20, )
    Defendants. )

### MEMORANDUM OPINION

U.S. D.J. Susan Paradise Baxter

## I.    Introduction

This opinion arises on cross-motions for summary judgment, with Plaintiffs and Defendants each urging the Court to resolve their claims as a matter of law. The complaint asserts seven counts under 42 U.S.C. § 1983. ECF No. 1. Plaintiffs seek summary judgment as to Counts I through V encompassing claims for false arrest, false imprisonment, excessive force, unreasonable search, and supervisory liability. ECF No. 50. Defendants, by contrast, move for summary judgment on all counts, including the remaining claims of civil conspiracy (Count VI) and substantive due process violations (Count VII). ECF No. 56.

On cross-motions for summary judgment, the Court's task is not to weigh the evidence but to determine whether a genuine dispute of material fact exists as to the reasonableness of Defendants' conduct under the Constitution. For the reasons set forth below, the Court will deny both motions in their entirety.

1

## II.    Factual Background

This action arises out of a manhunt conducted by the Pennsylvania State Police ("PSP") in June 2020. Plaintiffs are Sabrena and Blair Miller and Cassandra Gonzales. Cassandra is the adult daughter of the Millers and at the time of the incident, the three lived together at a home in Warren County, Pennsylvania. Defendants are: Kirk Reese, Greg Murphy, Francine Faso, Kyle Sweeney and multiple John Doe Police Officers, all employees of the Pennsylvania State Police.

During the course of the manhunt, the fugitive arrived at the Miller residence and PSP were notified. Plaintiffs are bystanders whose home became the site of a siege by PSP. They bring the following legal claims:

| | | |
|---|---|---|
| Count I | False Arrest | Gonzales v. Murphy |
| Count II | False Imprisonment | Gonzales v. Murphy |
| Count III | Excessive Force | Millers v. all Defendants |
| Count IV | Unreasonable Search | Millers v. all Defendants |
| Count V | Supervisory Liability | Millers v. Reese and John Does |
| Count VI | Civil Conspiracy | Millers v. all Defendants |

Following discovery, Plaintiffs concede that Defendants Faso, Sweeney, and the John Doe Officers should be dismissed from this action. Furthermore, Plaintiffs voluntarily dismiss the civil conspiracy count of their complaint. *See* ECF No. 63, p. 23.

Turning to the cross motions for summary judgment, the following facts are taken from the Responsive Concise Statements filed by Plaintiffs and Defendants. *See* ECF No. 64, 68. Many of these facts are undisputed, while others are contested. Any material factual disputes are noted where relevant.

2

<u>The Manhunt for a Fugitive</u>

On June 17, 2020, the Pennsylvania State Police and other local law enforcement agencies conducted a manhunt for Cody Potthoff ("Potthoff"), who was suspected of homicide, theft, and fleeing and eluding. ECF No. 64 ¶ 1. Plaintiff Casandra Gonzales, who had previously been in a romantic relationship with Potthoff and who served as a confidential informant, was contacted by Trooper Francine Faso in an attempt to locate Potthoff. *Id.* ¶ 2, 7.

At around 5:24 p.m. on June 17, 2020, Potthoff arrived at the Miller residence. ECF No. 64 ¶ 22. Upon his arrival, Sabrena Miller—Gonzales's mother—exited the residence and contacted Faso to inform her that Potthoff arrived. ECF No. 68 ¶ 5. Gonzales also sent a text message to Faso explaining that Potthoff was present at the residence. ECF No. 64 ¶ 22. At around 5:27 p.m., Faso contacted the PSP and reported that Potthoff was at the Miller residence with Gonzales, that he was an active flight risk, armed, and dangerous. ECF No. 57-2 p. 13 (internal p. 48); ECF No. 68 ¶ 13. Also, at 5:27 p.m. Defendant Corporal Murphy ("Murphy") was dispatched from the PSP Corry Barracks to the Miller residence. ECF No. 64 ¶ 27.

<u>Murphy's Arrival at the Miller Residence</u>
<u>and Initial Encounters</u>

During his drive to the Miller residence, Murphy was informed that Potthoff was on the back porch of the home with Gonzales, and that Gonzales was pregnant. ECF No. 68 ¶ 28. Murphy was also made aware that Potthoff was the suspect in at least one homicide. *Id.* ¶ 29. At around 5:42 p.m., Murphy arrived at the residence. *Id.* ¶ 8. Upon his arrival, Murphy, with his weapon drawn, engaged Gonzales and Potthoff on the back porch area of the residence. *Id.* ¶ 31. Gonzales raised her hands and walked towards Murphy. ECF No. 64 ¶ 35. Potthoff however entered the

Miller residence through the back door. *Id.* ¶¶ 19, 33. It is important to note that this is the sole encounter with Potthoff at the Miller residence– he is not seen again after 5:42 p.m.

One minute later, at around 5:43 p.m., Trooper Corey Schwab ("Schwab") also arrived at the residence and went directly toward Murphy and Gonzales. ECF No. 68 ¶ 10. Murphy then placed Gonzales in handcuffs. ECF No. 64 ¶ 36. Gonzales testified that Murphy originally requested that she "sit in the rocks by the tire" while handcuffed but Gonzales instead requested to be placed into a patrol vehicle for safety. ECF No. 57-4 at 5 (internal page 14). Gonzales was eventually released from handcuffs, but there is contradictory evidence as to the length of time which she remained restrained. According to Murphy, he believed that Gonzales was detained approximately "30-45 minutes max," although he admits that he was not present to see when she was freed from restraint. ECF No. 57-7, p.9 (Deposition of Murphy). Meanwhile, Gonzales recalls that she was only released after Blair Miller arrived on scene around 7:30 p.m. and he demanded that she be released. ECF No. 53-21, p. 21 (Deposition of Gonzales). Blair Miller's recollection corresponds with that of his daughter – he testified that he arrived on scene at 7:30 p.m. and Gonzales was released after his conversation with Reese. ECF No. 53-21, p. 88, 90.

Murphy testified that only sixty seconds elapsed from the time he arrived on scene until Gonzales was placed in the back of Trooper Schwab's vehicle. ECF 53-7 p. 18.[1] After Gonzales was secured, Trooper Schwab's vehicle was moved for a view of the front of the house and Defendant Murphy moved his vehicle for a view of the back of the house while they waited for

---

[1] Plaintiffs contend that around 10 minutes passed between Murphy's arrival and Gonzales' detention. ECF No. 68 ¶ 14.

4

other troopers to arrive to set a perimeter. ECF No. 64 ¶ 42.[2] After the perimeter was fully set, Murphy was notified that the front door of the house was open. *Id.* ¶ 43. At that time, Murphy realized Potthoff might have exited the house through the front door and relayed this information to Defendant Reese—the commanding officer of the entire operation.[3] *Id.* ¶ 44. Murphy never observed Potthoff flee the residence.[4] *Id.* ¶ 45. A police report written by Murphy after the incident explains, in part, that Gonzales advised him that Potthoff had made statements alluding to shooting "seven different people throughout the day" and that he was "in the residence and more than likely in a closet on the upstairs level." ECF No. 57-1 at 2. Plaintiffs dispute this fact stating that because Gonzales was placed in the back of a [Schwab's] patrol vehicle and taken to another location along the established perimeter, she could not have provided these details to Murphy. ECF No. 64 ¶ 46.

Communications Prior to Breaching the Miller Residence

At around 6:00 p.m., Sergeant Matthew Bly ("Bly") of the Troop E Major Case Team requested Special Emergency Response Team ("SERT") aid with a "barricaded gunman" at the Miller residence. ECF No. 68 ¶ 19. In response, at least 31 SERT members began deploying from across the Commonwealth to the Miller residence. *Id.* ¶ 20. At around 6:36 p.m., Murphy was

---

[2] Plaintiffs deny this averment but provide no alternative narrative as to the placement of Schwab's patrol vehicle after Gonzales's alleged arrest. *See* ECF No. 64 ¶ 42. Thus, this fact is considered undisputed. Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: ... consider the fact undisputed for purposes of the motion."). *See also* L.R.Civ.P. 56(E).

[3] At all relevant times, Defendant Kirk Reese ("Reese") served as the captain (and commanding officer) of Troop E of the PSP, and the Top Commander (i.e., "Topcom") concerning the SERT activation to the Miller residence. ECF No. 68 ¶ 27.

[4] Plaintiffs appear to dispute this fact but do not provide proper support for their denial. This fact is considered undisputed under Fed. R. Civ. P. 56(e)(2).

5

informed that a vehicle belonging to Kathleen Jensen ("Jensen Vehicle") was stolen about one mile away from the Miller residence. *Id.* ¶ 23. Murphy immediately assigned Trooper Heather Knapp to investigate the report of the stolen vehicle. ECF No. 64 ¶ 52. Reese arrived at the Miller residence at around 6:40 p.m.[5] ECF No. 64 ¶ 48; ECF No. 68 ¶ 29.

It is contested as to when Reese was apprised of the fact that the Jensen vehicle had been stolen from the neighbor's home and of the fact that the front door was suspiciously open. Defendants admit that Reese was informed of both the open front door and the stolen vehicle "during the course of the evening." ECF No. 68 ¶ 31. Plaintiffs contend that Reese was apprised of these facts immediately upon his arrival on the scene. *Id.* Reese testified that he was informed of a stolen vehicle in the area—which was consistent with Potthoff's modus operandi of stealing vehicles to flee from police—and, while at the command post, learned "at some point" about the open front door and stolen vehicle, later discussing with colleagues the possibility that Potthoff had exited through the door and taken the vehicle. ECF No. 53-11 at 19. Reese also testified that Blair Miller told him that it "was not typical for that [front] door to be open and used by family members and such…." ECF No. 64 ¶ 55; ECF No. 53-11 at 12.[6]

The SERT team (originally mobilized at 6:00 p.m.) was not prepared to complete a search of the Miller residence until 10:00 p.m. or later. ECF No. 68 ¶ 22. Blair Miller testified that he told Defendant Reese that "I will give you permission to search that house as long as you don't destroy it." ECF No. 57-06 (internal page 91). A search warrant was obtained for the Miller residence at

---

[5] Plaintiffs dispute that Reese arrived at 6:40 p.m. and instead assert that Reese arrived at 7:40 p.m. ECF No. 64 ¶ 48. However, the document cited by Plaintiffs states that Reese arrived at 1840 (6:40 p.m.). *See* ECF No. 53-18. This fact will be considered undisputed under Fed. R. Civ. P. 56(e)(2).

[6] In his deposition, Blair Miller described a four-foot drop because there were no steps between the front door and the ground. *See* ECF No. 53-20, p. 93, 100.

10:20 p.m. ECF No. 68 ¶ 38. The warrant stated that "[a] perimeter of the residence was established and Potthoff was confirmed to be inside the residence." *Id.* ¶ 38. SERT operations did not begin at the Miller residence until around 11:00 p.m., over five hours after the last sighting of Pottoff. *Id.* ¶ 42.

The SERT Operation

SERT attempted long-range acoustic devices ("LRADs"), robotics, and noise flash distraction devices ("NFDDs"), all with negative results. ECF No. 68 ¶ 43. At around 11:34 p.m., SERT moved a "BearCat" into position and began hailing the subject with negative results. *Id.* ¶ 45. From around 11:36 to 11:42 p.m., NFDDs (or flashbangs) were deployed into the second-floor bedrooms with negative results. *Id.* ¶ 46. At around 12:10 a.m., SERT cleared the basement and first floor of the Miller residence so that a drone could be deployed inside. *Id.* ¶ 47. The drone program was still in its infancy in June 2020. *Id.* ¶ 48. The drone operators flew two drones at the Miller residence: the Matrice, a bigger drone with more capabilities (including thermal imaging) and better resolution and the Maven, a smaller and more maneuverable drone. *Id.* ¶ 49. At around 12:40 a.m., "[a]s the drone gets to the 2nd floor landing, the drone operators call a white male wearing a gray sweatshirt moving right to left and they stated the drone was knocked down." *Id.* ¶ 59. Observers outside the residence reported a few minutes later that they saw what they believed to be a flashlight on the second floor. *Id.* ¶ 66.

On Reese's command at around 12:56 a.m., SERT deployed at least 42 cannisters of OC/CS gas cannisters into the second floor of the Miller residence. ECF No. 68 ¶ 68. The parties dispute whether the OC/CS gas cannisters were deployed in "one single continuous volley" or

"two, maybe three volleys of gas." *Id.* ¶ 69. At 3:16 a.m., the entry team completed clearing the structure and Potthoff was not inside. *Id.* ¶ 73, 75.

The Millers' residence was damaged and the home was uninhabitable for many months following the SERT operation. ECF No. 68 ¶ 77, 79. The following day, on June 18, 2020, Potthoff was arrested elsewhere. ECF No. 64 ¶ 76.

## III.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). When deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial."). If the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55, n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). In *Moore v. Walton*, 96 F.4th 616 (3d Cir. 2024), the Court of Appeals for the Third Circuit recently explained: "A genuine dispute exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Id.* at 622 (internal punctuation and citations omitted).

On the cross-motions for summary judgment here, the Court's task is not to weigh the evidence but to determine whether a genuine dispute of material fact exists as to the reasonableness of Defendants' conduct under the Fourth Amendment. Although reasonableness

is the constitutional touchstone for each of Plaintiffs' § 1983 claims, it operates differently depending on the claim asserted. For false arrest and false imprisonment, the inquiry is whether Defendants have demonstrated the absence of a genuine dispute that probable cause existed at the time of the seizure, as an arrest or pre-process detention supported by probable cause is reasonable as a matter of law. *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995). For Plaintiffs' excessive force claim, however, reasonableness is the explicit constitutional standard, requiring an assessment of whether the force used was objectively reasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004). The unlawful-seizure claim is governed by the same Fourth Amendment reasonableness principles, with the applicable metric—probable cause, reasonable suspicion, or objective reasonableness—depending on the nature and manner of the seizure. *Berg v. County of Allegheny*, 219 F.3d 261, 269–70 (3d Cir. 2000).

At summary judgment, each movant bears the burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law, with all reasonable inferences drawn in favor of the nonmovant. *Anderson*, 477 U.S. at 255. Where, as here, the parties file cross-motions, the Court must consider each motion separately, viewing the facts in the light most favorable to the party opposing the particular motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). Because Fourth Amendment reasonableness—particularly in the excessive force and seizure context—turns on disputed facts, competing inferences, and credibility determinations regarding the circumstances confronting the officers, it is ordinarily a question for the jury. *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002);

10

*Estate of Smith v. Marasco*, 430 F.3d 140, 147–49 (3d Cir. 2005). This case is no exception: the record is replete with disputed facts.

Defendants' assertion of qualified immunity does not alter this conclusion. In the Third Circuit, courts evaluate qualified immunity under a two-step inquiry, asking (1) whether the facts, viewed in the light most favorable to the plaintiff, show the violation of a constitutional right, and (2) whether that right was clearly established at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Where, as here, the underlying Fourth Amendment claims turn on disputed facts bearing directly on the objective reasonableness of the officers' actions—whether probable cause existed, the circumstances of the seizure, and the amount of force used—the qualified-immunity analysis cannot be resolved as a matter of law. The Third Circuit has repeatedly held that an officer is not entitled to qualified immunity at summary judgment where material factual disputes prevent the Court from determining whether a reasonable officer could have believed the conduct at issue was lawful. *Estate of Smith*, 430 F.3d at 154–55; *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Because a jury must first resolve the factual disputes underlying the reasonableness inquiry, Defendants have not met their burden of demonstrating entitlement to qualified immunity at this stage.

## IV.    Discussion

### Count I and II - False Arrest and False Imprisonment - Gonzales v. Murphy

Gonzales brings claims of false arrest and false imprisonment under 42 U.S.C. § 1983 against Murphy based on his actions in handcuffing and detaining her. The parties have cross-moved for summary judgment concerning her claims.

It is undisputed that Defendant Murphy handcuffed Gonzales and placed her in a patrol vehicle during an active police operation targeting an armed homicide suspect known to be present at the Miller residence. *See* ECF No. 64 ¶ 36; ECF No. 68 ¶ 13. Two competing narratives emerge. Gonzales contends Murphy lacked legal justification for this detention. She asserts: (1) officers knew her status as a confidential informant assisting their investigation; (2) Murphy was specifically informed she was not a suspect; and (3) the two-hour detention in a patrol vehicle exceeded permissible bounds for an investigatory stop.

Murphy counters with three main arguments of his own: first, he maintains that he lacked knowledge of Gonzales' informant status during the encounter. ECF No. 64 ¶ 11. Second, he characterizes the interaction as a reasonable investigatory detention justified by the dangerous circumstances: an armed fugitive at large in the vicinity. ECF No. 65 at 8. Third, he notes that Gonzales voluntarily requested placement in the patrol vehicle for safety reasons. *See e.g*, ECF No. 57-4 at 5. In the alternative, Murphy also asserts that qualified immunity shields him from liability even if the detention violated constitutional norms. ECF No. 58 at 18.

False arrest and false imprisonment are "nearly identical claims" that are "generally analyzed together," though they remain doctrinally distinct. *Brockington v. City of Philadelphia*, 354 F. Supp. 2d 563, 571 n. 8 (E.D.Pa.2005). False arrest concerns the legality of the arrest itself, while false imprisonment concerns the detention that follows. *Reedy v. Twp. of Cranberry*, 2007 WL 2318084, at *3 (W.D.Pa. Aug. 9, 2007).

In the United States Court of Appeals for the Third Circuit, a Fourth Amendment false arrest claim proceeds under a three-step framework: the plaintiff must show (1) a seizure, (2) that the seizure was unreasonable, and (3) that the defendant is liable for the violation. *Berg*, 219 F.3d at 269. A false imprisonment claim similarly requires proof that the plaintiff was detained and that

the detention was unlawful – most often because it was unsupported by probable cause. *Groman*, 47 F.3d at 636; *Pinkney v. Meadville, Pennsylvania*, 648 F.Supp. 3d 615, 635 (W.D. Pa. 2023).

*Plaintiffs' Motion for Summary Judgment*

Gonzales contends that Officer Murphy knew that she was assisting law enforcement and therefore lacked reasonable suspicion to detain her. If true, such knowledge would undermine any justification for the stop. *See United States v. Henley*, 469 U.S. 221, 226 (1985) (reasonable suspicion required for investigatory stops). *See also, Terry v. Ohio*, 392 U.S. 1, 22 (1968).

The record, however, belies this assertion, particularly when all reasonable inferences must be drawn in favor of the non-moving party. Murphy testified that he was unaware of Gonzales' status as a confidential informant. ECF No. 53-7 at 12. Similarly, Officer Faso—the trooper with whom Gonzales was cooperating—could not confirm whether she had communicated Gonzales' status to Murphy (ECF No. 57-2, p. 19 (internal page 71)) and Gonzales herself acknowledged that Murphy appeared unaware of her role. ECF No. 57-5 at 5 (internal page 15). Absent evidence that Murphy knew Gonzales was not a suspect, Plaintiffs have not established that the initial detention lacked reasonable suspicion as a matter of law.

Murphy further testified that he detained Gonzales because he arrived at a volatile scene involving a homicide suspect with another unidentified individual, and that Gonzales was held only until officers could ensure safety and determine "what we really had due to the circumstances." ECF No. 53-7 p. 17. This testimony both explains the purpose of the detention and frames when it might have become unreasonable.

13

Whether a detention escalates into an arrest turns on reasonableness under the totality of the circumstances, not a bright-line rule. *United States v. Torres*, 961 F.3d 618, 622 (3d Cir. 2020) (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995)). Courts assess both the law enforcement objectives justifying the stop and the time reasonably needed to achieve them. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). A detention becomes unreasonable once officers have resolved issues of identification and safety. *See e.g., Willowby v. City of Philadelphia*, 946 F. Supp. 369, 375 (E.D. Pa. 1996) ("…detention became unreasonable when the officers had control of the circumstances yet continued to detain the plaintiffs and other bystanders for reasons other than safety and identification").

Viewed in the light most favorable to Defendants, the record supports a finding that officers did not receive critical identifying information until Blair Miller objected to Gonzales' detention approximately forty-five minutes into the encounter, stating that Gonzales was his daughter and that she had contacted police. ECF No. 56-7, p. 20. At that point, the detention was promptly terminated. Before that time, Plaintiffs point to no evidence that Murphy knew Gonzales was the homeowner's daughter or a non-suspect informant.

On this record, a reasonable jury could conclude that Gonzales' restraint remained within the bounds of a permissible investigatory detention and did not ripen into an arrest. Summary judgment in Plaintiffs' favor is therefore inappropriate on these claims and their motion will be denied in this regard.

*Defendants' Motion for Summary Judgment*

Defendant Murphy advances three main arguments in support of his motion for summary judgment: (1) he lacked knowledge of Gonzales' confidential informant status; (2) the duration

14

and conditions of the detention were reasonable; and (3) Gonzales voluntarily requested placement in the patrol vehicle.

As discussed above, the record does not support a reasonable inference that Murphy knew Gonzales was a confidential informant at the time of her initial detention. Where one version of events is "blatantly contradicted by the record," it cannot be adopted at summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). No reasonable jury could find that Officer Murphy possessed such knowledge at the outset. That conclusion defeats any claim premised on the illegality of the initial stop, but it is not dispositive of whether the detention later became unlawful in duration or scope.

The Fourth Amendment permits brief investigatory detentions supported by reasonable suspicion, but such stops must remain reasonably related in scope and duration to their initial justification. *Terry*, 392 U.S. 1 at 30; *United States v. Sharpe*, 470 U.S. at 685. When officers prolong a detention or employ intrusive restraints, such as handcuffs, without adequate justification the encounter may escalate into a de facto arrest requiring probable cause. *Baker*, 50 F.3d at 1193.

Here, Gonzales was released from handcuffs after Blair Miller demanded her release. ECF No. 56-7 at 21. A jury could infer that officers were capable of resolving Gonzales' status earlier if reasonable steps had been taken. Murphy testified that Gonzales was detained due to "heightened circumstances," ECF No. 53-7 at 17, yet the record reflects that Officer Faso had previously shared personal details about Gonzales, including her identity and her pregnancy, with other officers. ECF No. 57-2 at 13. That information could have assisted in clarifying her connection to the residence sooner.

15

Even though Gonzales requested placement in the patrol vehicle for her own safety, she remained handcuffed throughout the detention despite her full compliance and no evidence of flight risk or danger. The record reflects that Gonzales obeyed commands, voluntarily entered the vehicle, and exhibited no resistance to officers. Although unknown to Murphy at the time, she was in fact an active confidential informant – a circumstance that further undermines any inference of threat or evasive behavior.

On these facts, a reasonable jury could conclude that the continued use of handcuffs for up to one hour and forty minutes, after the justification for heightened restraint dissipated or should have dissipated, transformed the detention into an arrest unsupported by probable cause. *See Baker*, 50 F.3d at 1193; *United States v. Martins*, 2022 WL 2805328, at *5 (E.D. Pa. July 15, 2022). Accordingly, summary judgment is inappropriate as to the false arrest and false imprisonment claims.

Finally, because the legality of the prolonged detention turns on disputed issues of fact, particularly when the justification for continued restraint dissipated, the Court cannot determine at this stage whether Murphy's conduct violated clearly established law. Resolution of Murphy's qualified immunity defense must therefore await factual findings by a jury.

## Count III Excessive Force - Millers v. Reese and Murphy

Next, the parties cross move for summary judgment on the excessive force claim against Reese and Murphy. Plaintiffs claim that Defendants used excessive force in the activation of the SERT team and the amount of force used at their home, while Defendants argue that the amount of force used in entering and securing the residence was reasonable in light of the situation.

16

The elements of a Fourth Amendment excessive force claim are: "(1) the occurrence of a seizure, which was (2) unreasonable under the circumstances." *Jones v. DeBonaventura*, 2026 WL 83941, at * 3 (D. Del. Jan. 12, 2026) (citing *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011)).[7] Reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 394-95). Accordingly, "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). While an officer may maintain that he "reasonably perceived the facts to be different from those alleged by the plaintiff," such arguments present questions properly reserved for trial. *Id.* at 199. However, Defendants may still "win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Shoffler v. City of Wildwood New Jersey*, 2019 WL 4165305, at * 10 (D. N.J. Sept. 3, 2019) (quoting *Kopec*, 361 F.3d at 777 and *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005)).

Factors that are weighed in order to determine reasonableness include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; (4) whether the physical force applied was of such an extent as to lead to injury; (5) the possibility that the persons subject to the police action are themselves violent or dangerous; (6) the duration of the action; (7) whether the action takes place in the context of effecting an arrest; (8) the possibility that the suspect may be armed; and (9) the number of persons with whom the

---

[7] The parties do not argue that a seizure did not occur. *See* ECF No. 51, 58.

police officers must contend at one time. *See Estate of Smith*, 430 F.3d at 150 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1977)).

*Plaintiffs' motion for summary judgment*

With these factors in mind, we turn to Plaintiffs' motion for summary judgment. Plaintiffs' theory of their excessive force claim is two-fold and based on two distinct points in time – 1) the initial activation of the SERT team and 2) SERT's use of force against the home which began over five hours after the last sighting of Pottoff and escalated over the next three hours. A review of the undisputed timeline is helpful to the ensuing analysis.

As to the SERT activation, the undisputed timeline is only thirty-six minutes. The suspect arrived at the Miller residence and Plaintiffs immediately notified PSP at 5:24 p.m. Eighteen minutes later, Trooper Murphy arrived on the scene, engaged Pottoff and Gonzales on the back porch, and Potthoff entered the home. One minute later, Trooper Schwab arrived on scene and Murphy handcuffed Gonzales. At 6:00 p.m., the SERT team was activated to assist with a "barricaded gunman." *See* ECF No. 53-10 at 1.

Plaintiffs argue that summary judgment should be entered in their favor because any reasonable officer would have known the Potthoff entered the residence through the back door and immediately escaped out the front door. However, the record evidence before this Court does not indicate when Murphy and Reese became aware that the front door was standing open. *See* ECF No. 57-9 , p. 3-6 (Deposition of Defendant Reese); 57-7, p. 6-8 (Deposition of Defendant Murphy).[8] Plaintiffs argue that at the time SERT was activated (6:00 p.m.), there was no evidence that Potthoff remained in the home, especially given that the front door (a door which

---

[8] *See also* ECF No. 53-20, p. 88 (Deposition of Plaintiff Blair Miller, who arrived on the scene around 7:30 p.m.).

18

the family never used because of a four foot drop to the ground) was standing open. But there is no record evidence to which Plaintiffs point to demonstrate that Defendants knew the front door to be open at that specific point in time. In opposition, Defendants argue that activating the SERT team was reasonable given that the PSP was in pursuit of a murder suspect who was known to be armed and dangerous and who was seen to have entered the home. The reasonableness of Defendants' actions in this regard will be for the jury to determine.

The same is even more true relative to the second part of Plaintiffs' excessive force claim. While the Fourth Amendment permits necessary property damage during warrant execution, it proscribes gratuitous destruction. *United States v. Ramirez*, 523 U.S. 65, 71 (1998). Again, reasonableness is the touchstone as to whether actions pass constitutional muster.

The evidence reflects what Defendants characterize as the measured escalation of tactics. Officers initially positioned a BearCat and issued verbal hails (ECF No. 68 ¶ 45), then deployed flashbangs (*id.* at ¶ 46), cleared portions of the residence to facilitate drone surveillance (*id.* at ¶ 47), and ultimately reported both a figure knocking down a drone and a flashlight moving inside the home (*id.* at ¶¶ 59, 66). Murphy further testified that Gonzales had informed him that Potthoff was likely hiding on the second floor, possibly in a closet. ECF No. 57-1 at 2. Officers testified to observing a white male in a hooded sweatshirt knock down a surveillance drone and a flashlight's glow on the second floor, with no indication that animals might account for these observations. ECF No. 53-16 at 11, 19; ECF No. 53-10 at 4. According to Defendants, these observations and intelligence justified increasingly heightened efforts to establish contact with any occupant.

Defendants maintain that the tiered approach was intended to provoke a reaction and assess whether anyone remained inside the residence. ECF No. 53-16 at 12. Plaintiffs counter that intervening information—specifically, the discovery at 6:36 p.m. of a stolen vehicle matching

Potthoff's modus operandi located approximately one mile away (ECF No. 68 ¶¶ 23, 33), combined with the unusually open front door suggesting flight through the residence (ECF No. 53-11 at 21)—should have dispelled, or at least substantially reduced, the perceived need for continued and intrusive deployment of OC gas canisters several hours later.

These competing narratives, each supported by record evidence, preclude summary judgment. Where "the reasonableness of force depends on disputed material facts, the question is for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999). A reasonable juror could credit either account, and that determination is material to whether the force used, measured against the exigencies confronting the officers, exceeded constitutional bounds. Plaintiffs' motion for summary judgment will be denied, as the reasonableness of the force employed remains a question for the jury.

*Defendants' motion for summary judgment*

Defendants also seek summary judgment on this claim arguing that the force used to secure the Miller residence was objectively reasonable as a matter of law. For the same reasons, that request will be denied. Viewed in the light most favorable to the Plaintiffs, the record would permit a reasonable jury to conclude that the force employed during the SERT operation was objectively unreasonable in light of evidence suggesting that the suspect may have already fled through the residence's unusually open front door (a door which the family did not typically use because of the four-foot drop to the ground) before the perimeter was fully established. The inference is reinforced by the subsequent theft of a vehicle consistent with the suspect's known methods, which Plaintiffs argue should have redirected police efforts.

A jury could also decline to credit Defendants' reliance on purported movements inside the home. Evidence concerning shortcomings in the drone program calls into question the reliability of those observations. These include two misidentified crashes, one of which incorrectly attributed canine movement to a hooded individual. On this record, a reasonable jury could weigh these operational failures and conclude that the force employed was not objectively reasonable.

Because both parties advance reasonable but conflicting interpretations of the evidence, a genuine dispute of material fact remains as to the reasonableness of the force used to secure the Miller residence. Summary judgment is inappropriate and will be denied. Finally, because the qualified immunity analysis turns on the same disputed facts that bear on the reasonableness of Defendants' conduct, it likewise cannot be resolved at summary judgment. Where, as here, the material facts concerning what officers knew and reasonably perceived at the time remain in dispute, the Court must leave to the jury the predicate factual determination underlying the qualified immunity inquiry. Only after those facts are resolved can the Court determine whether Defendants are entitled to qualified immunity as a matter of law.

<u>Count IV Unreasonable Search and Seizure – Millers v. Reese and Murphy</u>

Plaintiffs contend that their Fourth Amendment rights were violated because the search and seizure of their home was unreasonable.

The Fourth Amendment secures to citizens the right "to be secure in their persons...against unreasonable...seizures." *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024) (quoting *Graham*, 490 U.S. at 394). "Excessive or unnecessary destruction of property in the course of a

search may violate the Fourth Amendment." *Ramirez*, 523 U.S. 65 at 71; *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir.2001) ("A Fourth Amendment 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'"); *see also, e.g.*, *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997) (unnecessarily destructive conduct "beyond that necessary to execute a warrant effectively" may violate the Fourth Amendment); *Parker v. Fantasia*, 425 F. Supp. 3d 171, 188 (S.D.N.Y. 2019) (analyzing property destruction under the Fourth Amendment's reasonableness standard).

*Plaintiffs' Motion for summary judgment*

Plaintiffs contend that "[a]fter eight hours of no human visual or activity inside the Miller Residence, it was objectively unreasonable for the Defendants to assault the Residence, seizing and searching it for nothing." ECF No. 51, at 18. Because this claim turns on the same reasonableness inquiry as Plaintiffs' excessive force claim, it is likewise not suitable for resolution on summary judgment.

*Defendants' Motion for summary judgment*

Defendants' argument in support of summary judgment focuses on the validity of the search warrant and Blair Miller's consent. ECF No. 58 at 9. These arguments are unavailing. Defendants' focus on the lawfulness of the officers' entry does not resolve the separate question presented: whether the manner in which the search was executed constituted an unreasonable seizure under the Fourth Amendment. Plaintiffs do not dispute the legality of the officers' initial entry; they challenge the alleged use of excessive force and unnecessary property destruction during the search. The existence of a warrant or consent bears only on the lawfulness of the intrusion itself—not on the reasonableness of the officers' subsequent conduct. *See Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) ("An excessive force claim is a claim that a law

22

enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation such as an unreasonable entry.")

Assuming *arguendo* that the officers' entry was proper, a jury could nonetheless conclude that the execution of the search—including the alleged deployment of OC spray and gratuitous property damage—crossed constitutional limits. *See Ramirez*, 523 U.S. 65 at 71 (reasonableness of execution depends on proportionality). The lawfulness of the search is, in this context, beside the point; what matters is whether the officers' conduct in carrying it out was reasonable. Summary judgment will be denied.

<u>Count V Supervisory Liability – Millers v. Reese</u>

The contours of Plaintiffs' supervisory liability claims against Reese are poorly defined. The complaint alleges, in general terms, that at all relevant times Reese "directed his subordinates and/or acquiesced in his subordinates' conduct that he knew was violative of the Millers' federal rights." ECF No. 1, ⁋ 54. Although the parties have filed cross-motions for summary judgment on this claim, the lack of clarity in the pleading has resulted in arguments that do not align.

Against that backdrop, the Court turns to Plaintiffs' supervisory liability claim as detailed in their summary judgment brief. There, Plaintiffs explain that Reese was the sole decision maker and:

> "It was only at his direct[ion] that the use of force was implemented, and moreover, he was aware of the absence of human visuals or activity, the open front door, and the stolen Jensen vehicle. Nevertheless, at Reese's command at approximately 12:56 a.m., only 15 minutes after the alleged man/dog drone sighting, and despite no confirmation of human activity, SERT deployed at least 42 gas rockets into the second floor of the Miller residence. Therefore, this Court should find as a matter of law that Reese was responsible for the Fourth Amendment violations in this case as the commanding supervisor at the direction of whom all actions were taken."

ECF No. 51, p. 19. So, although the complaint does not clearly articulate the basis for the supervisory liability claim, Plaintiffs' briefing centers the claim on the deployment of OC rockets into the Miller residence. The Court therefore reviews the claim on that basis.

To sustain a claim of supervisory liability against senior law enforcement officials for their subordinates' alleged use of excessive force, Plaintiffs must demonstrate that the officials directed—or were deliberately indifferent to—conduct that they knew, or should have known, would result in a constitutional violation. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130–34 (3d Cir. 2010). Such a claim requires proof that Defendant Reese either participated in the constitutional deprivation, expressly authorized it, or knowingly acquiesced in the misconduct of those under his command. *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Supervisory liability hinges on the existence of an underlying constitutional violation by subordinate officers. *Santiago*, 629 F.3d at 130.

The reasonableness of the force employed remains a disputed factual question. Plaintiffs contend that Reese, despite being aware of the absence of visible human activity inside the residence, authorized the deployment of at least 42 O/C canisters into the home. If a jury were to credit this account and conclude that the force used was objectively unreasonable, then the same facts could support an inference that Reese knew—or should have known—that such tactics would result in an unconstitutional seizure of property or the application of excessive force. As detailed throughout this Opinion, reasonableness in these circumstances is not a matter for judicial determination at summary judgment; it is, instead, the core of what a jury must decide.

Because the constitutionality of the force used presents a factual dispute, Plaintiffs' motion for summary judgment must be denied and Defendants' motion fails for the same reason.

<u>Count VII - Substantive Due Process - Millers vs. Reese and Murphy</u>

Finally, Plaintiffs allege that Reese and Murphy "engaged in conduct deliberately intended to injure the Millers that was in some way unjustifiable by any government interest and arbitrary of the sort of official action that is more likely to rise to a conscience-shocking level of governmental arbitrariness." ECF No. 1, ¶ 58. Only Defendants move for summary judgment on this Fourteenth Amendment claim.

In both Defendants' opening brief and Plaintiffs' opposition brief, the parties offer little substantive analysis and instead cite legal precedent addressing the state created danger doctrine, a species of substantive due process. The doctrine "is an exception to the general rule that governments and government actors do not have an affirmative obligation to protect citizens from violations of life, liberty, or property committed by private actors." *Fedd v. Powell*, 2023 WL 5045923, at *3 (W.D. Pa. Aug. 8, 2023) (quoting *McGhee v. City of Philadelphia*, 2003 WL 22518759, at *2 (E.D. Pa. Oct. 23, 2003)). Those authorities, however, are inapposite here. The state created danger doctrine is traditionally understood to cover situations where the affirmative conduct of a state actor creates or increases the likelihood of danger from private actors. Liability is only actionable when a private third party's dangerous conduct injures the plaintiff.[9] The state created danger doctrine does not apply in this case as there is nothing in the record before this Court to suggest that these Defendants should be held liable for some harm perpetrated on the Plaintiffs by a private person.

---

[9] *See id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) ("When evaluating whether a plaintiff has asserted a claim under this theory, the Third Circuit has articulated a four-part test finding a state actor liability if: (1) the harm ultimately caused was foreseeable and fierily direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.")).

Because the state created danger doctrine has no application to the facts presented, Defendants' reliance on that line of authority fails to carry their burden under Rule 56 of demonstrating the absence of a genuine dispute of material fact or their entitlement to judgment as a matter of law. *See* Fed. R.Civ. P. 56(a). Accordingly, Defendants' motion for summary judgment will be denied.

## V.    Conclusion

For the reasons set forth above, the Court will deny Plaintiffs' Motion for Summary Judgment (ECF No. 50) and Defendants' Motion for Summary Judgment (ECF No. 56).

An appropriate Order follows.